VLADIMIR FRANKFURT,

      Plaintiff,

    v.

MEGA ENTERTAINMENT GROUP II, et al.,

      Defendants.

No. 15 CV 667

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Vladimir Frankfurt claims he was defrauded by defendant Alexander Field and two other individuals, Gary Fishkin and Edward Renko, in relation to a series of promissory notes. Frankfurt, proceeding *pro se*, brought claims against Field, Fishkin, and Renko, as well as entities Mega Entertainment Group II and Pavilion Restaurant & Petergof Banquet Hall. He sued the three individuals for violations of both federal and Illinois securities law, and he sued Fishkin and the entities for breach of contract. Fishkin and Renko failed to appear in this case, and an order of default was entered against them on August 18, 2016. *See* [99].[1] Each of the remaining parties now moves for summary judgment. For the following reasons, the motions are denied.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[1] Bracketed numbers refer to entries on the district court docket.

matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Apex Digital, Inc. v. Sears, Roebuck, & Co.*, 735 F.3d 962, 965 (7th Cir. 2013). And on cross-motions for summary judgment, a court must draw inferences "in favor of the party against whom the motion under consideration was made." *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 500 (7th Cir. 2008).

## II. Background[2]

As a threshold matter, defendants note that many of the facts asserted by Frankfurt find their source in his declaration, which contains much of the same language that appears in the complaint, and they request that any statement that appears in both the declaration and the complaint be stricken. [121] at 7. That

---

[2] The facts are taken from Mega, Pavilion, and Field's response to Frankfurt's LR 56.1 statement of material facts, [122]; Frankfurt's responses to Field's statement of facts, [124], and Mega and Pavilion's statement of facts, [126]; Field's response to Frankfurt's statement of additional facts, [154]; and Mega and Pavilion's response to Frankfurt's statement of additional facts, [155]. The responses contain both the asserted fact and the response. Any arguments raised in the LR 56.1 statements and statements that are unsupported by admissible evidence (or where a party fails to follow LR 56.1's direction to cite to supporting material in the record) will be disregarded. Only those facts which are properly controverted will be considered disputed. While technical errors made by *pro se* plaintiffs like Frankfurt may be forgiven, those plaintiffs still must abide by the Federal and Local Rules. *See, e.g., Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006). Defendants are represented by counsel, and they must comply with the rules. *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011).

request is denied. Defendants cite to *Malec v. Sanford*, 191 F.R.D. 581 (N.D.Ill. 2000), in which Judge Castillo found that the plaintiff could not use affidavit testimony in support of summary judgment where the testimony was not based on personal knowledge. *Id.* at 584–85. Defendants suggest that any affidavit that repeats the allegations of the complaint cannot be used to support a summary judgment motion. Not so. So long as Frankfurt's declaration is based on personal knowledge (and defendants do not claim otherwise), it may be used to support his motion for summary judgment. The undisputed facts follow.

In August 2005, plaintiff Vladimir Frankfurt met with Gary Fishkin to discuss one of Fishkin's companies, Capital Development Group, LLC. [122] ¶ 10. In addition to Fishkin, Capital's members included Edward Renko and defendant Alexander Field. [122] ¶¶ 4–6, 10. At their meeting, Fishkin explained to Frankfurt that Capital was in the construction business and in good financial condition, and he asked Frankfurt to buy a promissory note from Capital for $100,000 with a 12% annual interest rate. [122] ¶ 10. Frankfurt agreed and gave Fishkin a check for the money, payable to Capital. [122] ¶ 10. In return, he received a note dated August 1, 2005, with a maturity date of August 1, 2006, naming Capital as the borrower, and signed by Fishkin as its Vice President. [122] ¶¶ 10–11. The note stated that the money would be used for "developing various projects." [122] ¶¶ 11, 34.

One year later, over the course of several meetings, Fishkin asked Frankfurt to buy a promissory note from EAG Capital Holdings, Inc., another company owned by Fishkin, Renko, and Field. [122] ¶¶ 4–6, 13. EAG was an umbrella corporation

that owned Capital and other entities. [122] ¶¶ 13, 44; [155] ¶ 2. Fishkin represented to Frankfurt that EAG and the other entities were in good financial condition, and that an investment in EAG would be safe. [122] ¶ 13. As a result, Frankfurt agreed to use the money he had invested in Capital to buy a promissory note from EAG. [122] ¶ 13. The new note was dated August 1, 2006, had a maturity date of August 1, 2007, named EAG as the borrower, and was signed by Renko as EAG's CEO. [122] ¶ 14.

In August 2007, Fishkin again represented to Frankfurt that the companies were in good financial condition. [122] ¶ 15. He asked Frankfurt to renew the note, and Frankfurt agreed. [122] ¶ 15. The new note was dated August 1, 2007, had a maturity date of August 1, 2008, named EAG as the borrower, and was signed by Field as EAG's president. [122] ¶ 15.

The following year, Frankfurt met with Fishkin in EAG's office.[3] [122] ¶ 16. Fishkin asked Frankfurt to renew the note again, explaining that they had received additional funding from Russian investors and were in the process of diversifying their businesses. [122] ¶ 16. He also said that the businesses remained in good financial condition despite the general economic downturn. [122] ¶ 16. Based on those representations, Frankfurt renewed the note for an additional year. [122] ¶ 16. The note was dated August 1, 2008, had a maturity date of August 1, 2009, named EAG as the borrower, and was signed again by Field as its president. [122]

---

[3] The parties dispute whether Field attended this meeting. According to Frankfurt's declaration, Field was there, but Field denies that he attended any meetings with Frankfurt and Fishkin involving the notes executed in 2008 or 2009.

¶ 17. Unlike the previous notes, that note contained a term that allowed Frankfurt to demand repayment of the principal and interest at any time upon 30 days' written notice. [122] ¶ 17.

In September 2008, defendants finished a year-long project to build Pavilion Restaurant and Petergof Banquet Hall. [122] ¶ 35; [155] ¶ 11. The building housing the restaurant and banquet hall belonged to defendant Mega Entertainment Group II, LLC, which was also owned by Fishkin, Renko, and Field (among others).[4] [122] ¶¶ 4–6, 44; [155] ¶ 2. After its opening, Fishkin gave Frankfurt and other investors a tour of the place. [122] ¶ 43; [155] ¶ 17; [154] ¶ 17. Frankfurt did not know, however, that between 2006 and 2008, Field and the others were struggling for cash and trying to negotiate an extension on a $26 million loan related to one of their property developments.[5] [122] ¶¶ 32–33. After negotiating six extensions on the

---

[4] Whether Pavilion and Petergof are "merely assumed names of Mega related to its operation," or whether they constitute a separate entity or separate entities, is in dispute. [122] ¶¶ 45–46; [126] ¶ 12. This factual dispute is immaterial to the issues at hand, however, and defendants Mega and Pavilion and Petergof will be referred to collectively as "Mega."

[5] This fact and others are supported by statements from a plea agreement entered by Field in an unrelated criminal case. Defendants object to the admission of those statements based on Federal Rule of Evidence 410, which prohibits the admission of a plea agreement that was later withdrawn, but cite no authority to suggest that that rule excludes plea agreements that were not withdrawn. They also object because Frankfurt did not submit every page of the plea agreement with his motion. Defendants argue that, because the document is incomplete, they cannot assess the accuracy of the document. But they do not actually dispute the accuracy of the document, and Field cannot plausibly claim to be unable to assess the accuracy of his own plea agreement. Regardless, Frankfurt requests that judicial notice be taken of a complete copy of the plea agreement and the facts recited therein. *See* [132], [148]. That request is granted. Judicial notice may be taken of facts recited in a plea agreement. *See Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995) ("Admissions—in a guilty plea, as elsewhere—are admissions; they bind a party; and the veracity safeguards surrounding a plea agreement that is accepted as the basis for a guilty plea and resulting conviction actually exceed those surrounding a deposition.") (citation omitted). Therefore, I consider those facts undisputed.

loan between December 30, 2006, and September 4, 2008, they defaulted on the loan. [122] ¶¶ 32–33. By 2009, Capital and EAG were dissolved, and Mega's headquarters had moved from the office it had shared with EAG and Capital to the location of the restaurant. [122] ¶¶ 2, 20.

Frankfurt requested payment of the interest accrued on the 2008 note several times, but defendants refused. [122] ¶ 62. At the end of 2008, he invoked the acceleration clause and demanded repayment of the principal and interest. [122] ¶ 62. On January 5, 2009, Frankfurt met with Fishkin and Renko in the EAG office, and they told him that they could not make payments on the note, blaming market conditions. [122] ¶ 63. But they said the restaurants were doing fine, and that they would repay the note upon its maturity. [122] ¶ 63. The parties dispute whether Field was present at this meeting. [122] ¶ 63. Later that month, the Illinois Securities Department told Frankfurt that the notes were not registered with the Secretary of State, in violation of Illinois securities laws. [122] ¶ 64. On January 29, 2009, Frankfurt sent Field, Renko, and Fishkin a letter demanding rescission of the note and requesting repurchase. [122] ¶ 65. Fishkin refused, telling Frankfurt that the notes were loans and not governed by securities law. [122] ¶ 66.

When the note matured on August 1, 2009, Frankfurt contacted Fishkin and requested repayment and threatened to sue if he did not receive payment. [122] ¶ 68. Fishkin asked Frankfurt for an extension until early 2010, because they were working hard to pay off other debts and to increase business. [122] ¶ 69. Frankfurt agreed to extend the maturity date of the note to the beginning of 2010. [122] ¶ 70.

In March 2010, according to Frankfurt, he met with both Fishkin and Field at the restaurant, and they both told him that they had met with financial success and could start paying back investors. [122] ¶ 71. But Field's presence and participation at that meeting is in dispute. [122] ¶ 71. Fishkin and Frankfurt negotiated terms, and Frankfurt eventually agreed to extend the maturity date of the note to the end of 2011, based on Fishkin's representations that their financial success would allow them to repay the note in full in early 2012. [122] ¶ 72. Frankfurt says that the terms of his agreement with Fishkin were as follows: the defendants would pay Frankfurt $1,000 per month from April 2010 through December 2011, and then pay the remainder in a lump sum in early 2012, and in return, Frankfurt would not file a claim based on a breach of the 2008 promissory note. [122] ¶ 73.

Between April and the following February, Frankfurt received ten monthly payments in the form of checks, totaling $10,000. [122] ¶ 74. But the check he received in February 2011 bounced. [122] ¶ 74. Frankfurt met with Fishkin and Field several times in the Petergof building in March and April 2011. [122] ¶ 75; [154] ¶ 34. They explained that the payments had stopped because Frankfurt had cooperated with an investigation by the Illinois Securities Department, and that they would be restarted if he agreed to stop communicating with the agency and sign a nondisclosure agreement. [122] ¶ 76; [154] ¶ 34. Frankfurt refused these terms. [122] ¶ 76; [154] ¶ 34. Frankfurt made several more requests for payments, but they never restarted. [122] ¶ 77.

In August 2014, Frankfurt learned that the businesses had struggled in 2006 to 2008, and that Field and the others had extended the maturity date for a $26 million bank loan six times. [122] ¶ 79; [154] ¶ 36; [155] ¶ 36. He also learned that they had been in default on the loan when they had convinced Frankfurt in March 2010 to extend the maturity date of his note. [122] ¶ 79; [154] ¶ 36; [155] ¶ 36. Had he known of their critical financial condition, Frankfurt would not have extended the maturity date of the note in March 2010. [122] ¶ 80.

Certain aspects of the parties' dispute depend on Mega's ownership and history. In 2007 and 2008, when Mega shared an office with EAG and Capital at 3100 Dundee Road in Northbrook, Illinois, Mega did not have a lease.[6] [122] ¶ 51. Also, Fishkin was an owner, director, and member of Mega from 2007 to 2013, at which time he owned 50% of Mega. [122] ¶ 54; [155] ¶ 8. Fishkin was also involved in all activities related to the conception and construction of the restaurant and banquet hall, and later served as its general manager and operating manager. [122] ¶¶ 42, 55; [155] ¶ 9. But Mega's management changed in 2013, and its ownership changed in 2014. [122] ¶¶ 53, 60–61. Field's sister, Marina Zarovsky, has been an owner of Mega since its inception, but she is now the sole owner, member, and

_____

[6] To support the assertion that Mega did not have a lease, Frankfurt cites to Mega's response to a discovery request. In response to a request for the lease agreement for "Mega's Office at 3100 Dundee Rd., Northbrook, IL for 2007 and 2008," Mega responded that "[t]here is no such lease." [116-3] at 16; [122] ¶ 51. Mega cites to the same document in its LR 56.1 response and explains that it took that position in discovery because Mega does not currently have an office in that location. [122] ¶ 51; [155] ¶ 1. But the request clearly identified the time period as 2007 and 2008, and Mega does not dispute that before 2009, it maintained an office at that address. [122] ¶ 2. Mega does not suggest that there once was a lease, but that it is no longer in Mega's possession. Thus, I accept as undisputed the fact that Mega did not have a lease agreement for its office, which it shared with EAG and Capital.

manager of Mega.[7] [122] ¶ 61; [154] ¶¶ 10, 23; [155] ¶¶ 10, 23. And Field's wife, Tatyana Furman, is the general manager of the restaurant and banquet hall. [122] ¶ 60; [154] ¶ 10; [155] ¶ 10.

Mega and the other defendants do not employ robust record-keeping procedures. Capital was the contractor for the construction, hiring multiple subcontractors and paying them, at a minimum, several hundreds of thousands of dollars.[8] [122] ¶¶ 36, 38, 40; [154] ¶¶ 13, 15; [155] ¶ 13, 15. Frankfurt managed to find publicly-available documentation of those subcontractor relationships, but Mega said in its discovery responses that it did not have in its possession any checks, financial documents, and contracts with contractors, including Capital, related to the construction of the restaurant and banquet hall. [122] ¶¶ 47, 48. Field said in his discovery responses that he did not have any documents related to

---

[7] Zarovsky testified that she became an owner through the purchase of shares, but has no written documentation that could confirm her share purchase. [154] ¶ 23; [155] ¶ 23.

[8] Frankfurt submits documentation of several of Capital's subcontractor relationships. Defendants object to the admissibility of several of those documents as unauthenticated business records, and Frankfurt filed a motion in response, explaining that those documents were filed in unrelated cases in the Circuit Court of Cook County, and requesting that judicial notice be taken of them. *See* [132], [159]. Frankfurt wants to file those documents, in part, to show that Capital did engage subcontractors to construct the restaurant and banquet hall. But it is undisputed that Capital engaged subcontractors to build the restaurant and banquet hall, and the precise number of documented subcontractor relationships is immaterial to the issues at hand. Adding a few more will not change the disposition of the cross-motions. Frankfurt also wants to show that defendants were uncooperative in discovery when they claimed to not be in possession of documents related to contractors involved in the construction and maintenance of the restaurant and banquet hall. But Frankfurt does not request any particular relief as a consequence of defendants' conduct, and the fact that defendants were in possession of certain documents in the past does not prove that they were being dishonest when they said they were not in possession of those documents when responding to Frankfurt's discovery requests. For the most part, the admission of those documents would not affect the analysis of the cross-motions. Frankfurt's first motion for judicial notice, [132], is granted only as to Field's plea agreement, as explained above. That motion and [159] are otherwise denied.

payments made from Mega to Capital and EAG after the project was complete, or any contracts or financial documents between Capital or EAG and subcontractors related to the construction. [122] ¶¶ 49–50. Finally, Mega said in its discovery responses that it did not have any documents related to utility payments in 2007 and 2008. [122] ¶ 51.

## III. Analysis

### A. Rule 10b-5 (Count I)

Count I of the complaint alleges violations of both the Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, which was promulgated under § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(a)(2). The parties refer to both Rule 10b-5 and § 12(a)(2) as if they supplied the same cause of action, but their arguments relate to only the cause of action under Rule 10b-5. Therefore, I consider only the 10b-5 claim.[9] To prevail on that claim, a plaintiff must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 414

---

[9] Section 1658's five-year statute of repose does not, by its language, apply to strict liability claims under § 12(a)(2) of the 1933 Act. *See Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2004 WL 574665, at *13–14 (N.D.Ill. Mar. 22, 2004). The 1933 Act has its own statute of repose for those claims. "A claim under § 12 arises when the security is first offered to the public, 15 U.S.C. § 77m, and a statute of repose sets three years as the outer limit for suit." *McCormick v. Indep. Life & Annuity Co.*, 794 F.3d 817, 820 (7th Cir. 2015). As a result, any § 12(a)(2) claim is certainly time-barred, and for this additional reason, I consider only whether Frankfurt has a triable claim under Rule 10b-5.

(7th Cir. 2015), *reh'g denied* (July 1, 2015) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, ⸻ U.S. ⸻, 134 S.Ct. 2398, 2407 (2014)).

Frankfurt seeks summary judgment on the 10b-5 claim against Field, and he bases the claim on the events surrounding the March 2010 meeting.[10] According to Frankfurt, he met with both Fishkin and Field in March 2010; they misrepresented their businesses as being in good financial condition, which would allow repayment on his note in installments; and neither Fishkin nor Field told him that they had recently defaulted on a $26 million loan. Based on that discussion, Frankfurt agreed to change the terms of the 2009 note, extending its maturity date, and to forbear from filing a lawsuit. Had he known about their dismal financial situation, he never would have extended the note, and he would have sued immediately. As a result of the misrepresentations, Frankfurt has not been fully paid on his investment. Field argues that he did not make any actionable misrepresentations or omissions, that Field cannot be liable because he acted on behalf of EAG, and that the claim is time-barred.

Frankfurt's cross-motion is denied, because Field's presence at the March 2010 meeting is in dispute. It is possible that Field did not participate in that meeting at all. Because Frankfurt's claim against Field is based on the misleading information he received at the March 2010 meeting, Field's disputed attendance

---

[10] In his opening brief, Frankfurt sought to bring the securities fraud claims (counts I and II) against Mega and Pavilion, as well. Defendants note that the complaint did not allege those claims against Mega and Pavilion, and they argue that it is too late to do so now. Frankfurt does not respond to that argument and seems to have abandoned his attempt to name those additional defendants. As a result, I consider the securities fraud claims as against Field alone.

presents a genuine issue of material fact. Thus, Frankfurt's cross-motion for summary judgment is denied with respect to the 10b-5 claim.

Field's cross-motion is also denied. Field argues that, even if he did make the representations that Frankfurt identified, Frankfurt cannot show that Field made a material misrepresentation or omission. Field concedes that rule 10b-5 requires disclosure when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). But he states, without explanation, that information regarding the defaulted $26 million loan was immaterial. An omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). It makes sense that, when discussing the financial health of a company in which he is investing, a reasonable investor would consider the potential insolvency of that company, and that a recent default on a large loan would affect his analysis.[11] Field does not explain why he believes no reasonable jury would consider the omission material. As a result, he is not entitled to judgment as a matter of law on that ground.

Field also claims, again without explanation, that a representation that his businesses were in good financial condition is not actionable because it amounts to a

---

[11] Frankfurt does not explicitly describe the connection between EAG and the $26 million loan, but as explained in Field's plea agreement in an unrelated case, EAG was a corporate guarantor on the loan. *See* [148] at 3.

vague opinion that he did not know to be incorrect at the time. But even general statements as to a company's status may be misleading if they are "concealing a disaster." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 745 (7th Cir. 1997). Field concedes that the statement was incorrect, and he does not explain how making that affirmative representation while omitting the default would not be misleading, especially in the context of explaining EAG's ability to take on more debt and repay that debt. To the extent that Field's argument is based on a lack of proof of his knowledge of the financial condition of EAG and the other businesses, he is disputing the scienter element of the claim. Proof of scienter requires proof that the defendant either knew that the statement was false (or misleading, in the case of a material omission) or was reckless in disregarding a substantial risk that it was so. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) (citing *Higginbotham v. Baxter International, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)). It is undisputed that Field and his businesses had defaulted on a $26 million loan after Field had negotiated an extension on the loan's maturity date six times, and that the businesses were not in fact in good financial condition when Frankfurt discussed extending the note. A reasonable inference is that Field was aware of those events and the condition of his own companies. Field is not entitled to summary judgment on the basis of the first two elements of the claim.[12]

---

[12] Field does not discuss the remaining elements of the claim. He does not challenge the connection between the misrepresentation and omission and the March 2010 transaction (or whether the March 2010 transaction constitutes a purchase or sale of a security). And he does not discuss the elements of reliance, loss, or loss causation. Therefore, I do not address those elements, either.

Field also argues that he is shielded from liability in a Rule 10b-5 claim because he acted on behalf of EAG and not in his individual capacity. He cites to the Illinois LLC Act, 805 ILCS 180/10-10(a), which provides that a member or manager of an LLC "is not personally liable for a debt, obligation, or liability of the company solely by reason of being or acting as a member or manager." He also cites to *Carollo v. Irwin*, 2011 IL App (1st) 102765, which relied upon that statute to hold that a corporate agent who entered into a contract on behalf of a company was not personally bound to that contract. *Id.* ¶ 63. Field's argument misses the mark, because Frankfurt is not asserting a breach of contract action against him, and it is Field's own conduct, not his status as a member or manager of EAG, that exposes him to liability here. Field does not cite to any authority to suggest that the LLC Act shields corporate officers from liability in 10b-5 actions. In such an action, liability attaches to the maker of the misrepresentation—"the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Glickenhaus*, 787 F.3d at 424 (quoting *Janus Capital Group, Inc. v. First Derivative Traders*, —— U.S. ——, 131 S.Ct. 2296, 2302 (2011)). If Field participated in the March 2010 meeting and spoke, he would undoubtedly be the maker of those verbal statements. His argument that the LLC Act precludes liability fails.

Finally, both Field and Mega argue that the claim is time-barred.[13] Federal securities fraud claims brought under § 10(b) of the Securities Exchange act are

---

[13] Though Frankfurt brings the 10b-5 claim against Field alone, Mega seeks its dismissal because it is the only claim giving rise to federal subject-matter jurisdiction.

subject to a five-year statute of repose. *See* 28 U.S.C. § 1658(b). The statute of repose begins running from the date of the alleged misrepresentation or omission giving rise to the claim. *McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 932 (7th Cir. 2011). And the time to file under a statute of repose cannot be extended by equitable estoppel or equitable tolling. *Id.* at 930.

The parties dispute when the statute of repose began to run on Frankfurt's claim. Defendants provide four different possible start times, all of which result in an extinguished claim: (1) in 2005, when Fishkin told Frankfurt that the first promissory note would be used for developing specific projects and Frankfurt purchased the note, [151] at 5, [153] at 5; (2) in 2006, when Fishkin (and possibly Field) represented that the businesses were in good financial condition, [114] at 14, [115] at 15; (3) on August 1, 2008, when Fishkin (and possibly Field) represented again that the companies were in good financial condition, [151] at 6, [153] at 6; and (4) in 2009, when Fishkin told Frankfurt that they could not pay him and Frankfurt threatened to sue, [114] at 14, [115] at 15. Frankfurt argues that the period began to run in March 2010—less than five years before he filed suit—when Fishkin and Field made representations about the businesses' financial health and they negotiated an amendment to the 2008 promissory note.

Defendants provide no further explanation as to which of the four events started the clock on Frankfurt's claim. They simply refer to the continuing violation doctrine, which allows a suit "to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought." *Limestone Dev. Corp. v. Vill. of*

*Lemont, Ill.*, 520 F.3d 797, 801 (7th Cir. 2008). Defendants correctly point out that that doctrine involves cumulative violations and does not apply to "a series of discrete acts, each of which is independently actionable, even if those acts form an overall pattern of wrongdoing." *Kovacs v. United States*, 614 F.3d 666, 676 (7th Cir. 2010) (quoting *Rodrigue v. Olin Employees Credit Union*, 406 F.3d 434, 443 (7th Cir. 2005)). But the inapplicability of that doctrine does not help defendants if, as Frankfurt suggests, the March 2010 meeting and contract are independently actionable under Rule 10b-5 and started the clock anew.

Defendants argue that the events of the March 2010 meeting cannot form the basis of the 10b-5 claim, because the complaint described the March 2010 contract as relating to a payment plan and did not allege that any fraud occurred when entering into the contract. *See* [151] ¶ 8; [153] at 6–7. They argue that Frankfurt changed his position in an attempt to circumvent the statute of repose. The complaint did describe the March 2010 contract as setting out terms of a payment plan for the 2008 promissory note, but that description is consistent with Frankfurt's description at summary judgment—Frankfurt agreed to extend the time at which the note would be paid, collecting interest during that additional period. In other words, Frankfurt agreed to extend the maturity date of the note. And the complaint alleged that Frankfurt bought and extended the notes based on misrepresentations of the financial health of the companies, which formed the basis of the fraud claim. The complaint did not specifically allege that defendants made any fraudulent statements at the March 2010 meeting. It may be that defendants

believe that a fraud claim based on the March 2010 meeting was not pled with the particularity required by Federal Rule of Civil Procedure 9(b). But defendants fail to explain and develop their argument, and they do not cite to Rule 9(b) or to any legal authority. Moreover, they make the argument in the reply briefs on their cross-motions for summary judgment, but not in their response briefs on Frankfurt's cross-motion, even though Frankfurt's legal theory has been consistent throughout the briefing on the cross-motions. Because defendants failed to develop the argument and did not raise it in their response to Frankfurt's cross-motion, it is forfeited. Defendants do not otherwise explain why the statute-of-repose period would begin to run before March 2010. Therefore, Field's and Mega's cross-motions for summary judgment are denied with respect to the statute-of-repose defense.

**B.      Illinois Securities Law of 1953 (Count II)**

The Illinois Securities Law of 1953 prohibits obtaining money or property "through the sale of securities by means of any untrue statement of a material fact or any omission." 815 ILCS 5/12(G). The elements of the claim substantially overlap with those of a 10b-5 claim. To prevail, a plaintiff must demonstrate that the defendant (1) made a misstatement or omission of material fact, (2) in connection with the purchase or sale of securities, (3) upon which the plaintiff relied. *Tirapelli v. Advanced Equities, Inc.*, 351 Ill.App.3d 450, 455 (1st Dist. 2004). Frankfurt seeks summary judgment on the claim against Field based on the same facts that support his federal claim. His cross-motion is denied for the same reason—whether Field took part in the March 2010 meeting is disputed. In Field's cross-motion, he makes

no relevant legal arguments and attacks only the adequacy of Frankfurt's response to a discovery request for documents that support the claim. *See* [115] at 13–14. Because the claim is based on oral representations and publicly-filed documents, the dearth of documentary evidence is unsurprising. Field makes no other reference to the claim in his cross-motion, so the cross-motion is denied.

### C.    Breach of Contract (Count III)

To prevail on a claim for breach of contract under Illinois law, a plaintiff must prove: (1) the existence of a valid and enforceable contract; (2) the performance of the contract by plaintiff; (3) the breach of the contract by defendant; and (4) a resulting injury to plaintiff." *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001) (quoting *Hickox v. Bell*, 195 Ill.App.3d 976, 992 (5th Dist. 1990)). Frankfurt seeks summary judgment on the breach of contract claim, based on the same March 2010 meeting that formed the basis of the securities fraud claims, against Mega. He contends that Fishkin and he entered into an oral contract, agreeing that Mega would pay Frankfurt on his 2008 promissory note in installments of $1,000 per month from April 2010 through the end of 2011, followed by a lump sum payment of the remainder of the note. They also agreed that in return, Frankfurt would refrain from filing a claim based on a breach of the note. Frankfurt performed under the contract, but Mega breached the contract and caused injury when the monthly payments stopped and never resumed.

Mega does not dispute that the contract Frankfurt entered into in March 2010 was valid and enforceable, that Frankfurt performed his obligations under the

contract, that the counterparty breached, or that Frankfurt suffered injury as a result. It disputes only that Fishkin bound it to the contract, and argues that Frankfurt does not present sufficient evidence to show that Fishkin represented Mega when he entered into the March 2010 contract.

It is undisputed that Fishkin had the authority to bind Mega to a contract, but the parties provide limited evidence as to whether he did so. No written documentation of the contract has been produced. And Frankfurt relies primarily on his recollection of events, as recited in his declaration. Frankfurt notes that he met with Fishkin in the restaurant and received his checks there. But as Mega points out, the fact that meetings occurred in the restaurant does not shed light on what the parties intended at the March 2010 meeting. Zarovsky and Field both testified by affidavit that Fishkin did not bind Mega to the contract. But that is of limited value—Field also testified that he did not attend that meeting (though Frankfurt claims otherwise), and it is undisputed that Zarovsky was not involved at the time. As a current representative of Mega, Zarovsky may be competent to assert that Mega was not a party to any contract formed in March 2010, but this at most raises a dispute that would require a fact-finder to resolve based on Frankfurt's and Zarovsky's credibility. Mega states, without support, that Fishkin entered into the contract either on behalf of Capital or EAG or in his individual capacity. Frankfurt responds that Fishkin could not have been acting on behalf of Capital or EAG, because both companies had been dissolved by March 2010, and that he could not have been acting in his individual capacity, because he was not a signatory to or a

personal guarantor of the 2008 note.[14] Drawing inferences in Frankfurt's favor, Fishkin—an owner of Mega—said that Mega would pay Frankfurt. That is sufficient to raise a dispute over whether Mega was a party to the March 2010 contract, and precludes summary judgment for either side.

### D.    Motion to Compel

In addition to his cross-motion for summary judgment, Frankfurt filed a motion to compel defendants to produce certain documents. *See* [162]. In discovery, Frankfurt requested ownership documents for the restaurant and banquet hall, and Mega responded that it "does not own the property and therefore cannot provide these documents." [114] at 46, ¶ 4. Mega now concedes that it did own that property. [122] ¶ 46. In light of Mega's concession, Frankfurt renews his request for those documents. Frankfurt's motion is granted in part. Mega shall produce records demonstrating its ownership of the restaurant and hall.

---

[14] Frankfurt's point that Fishkin could not have been acting in his individual capacity because he was not personally liable for the 2008 note suggests that Frankfurt believes Fishkin acted only on behalf of the those parties bound to the 2008 note. But Mega was not a named party to the 2008 note (EAG was the borrower), so for Mega to be bound to the 2008 note, Frankfurt would have to prove that Mega was an alter ego of EAG. "Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice." *Northbound Grp., Inc. v. Norvax*, Inc., 795 F.3d 647, 652 (7th Cir. 2015) (quoting *Main Bank of Chi. v. Baker*, 86 Ill.2d 188, 205 (1981)). In a breach of contract case, courts typically "apply an even more stringent standard to determine when to pierce the corporate veil than in tort cases." *Saletech, LLC v. E. Balt, Inc.*, 2014 IL App (1st) 132639, ¶ 26 (quoting *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill.App.3d 1019, 1033 (1st Dist. 2007)). Frankfurt has some evidence that the entities ignored the corporate form, and there are factual disputes over whether assets were commingled. But overall, the parties have not adequately addressed the concept of alter ego liability such that that issue can be resolved at summary judgment.

Frankfurt also takes issue with the defendants' lack of documentation of Zarovsky's purchase of shares in Mega or of subcontractor agreements related to the construction of the restaurant and banquet hall. Frankfurt already moved to compel defendants to search for Mega's financial and accounting records, [102], after which I ordered Mega to explain its search for records. *See* [104]. Zarovsky filed an affidavit identifying the third-party accounting firm that had been entrusted with record-keeping duties, explaining that neither she nor Field could get a response from that firm or its employees, and that she had produced all of the requested documents in her possession. *See* [105]. Frankfurt did not find this explanation credible and filed a second motion to compel. *See* [10]. I denied that motion and informed Frankfurt that he could raise the consequences of their lack of documents at summary judgment. [108]. The pending motion to compel treads the same ground as the last two. As a result, it is denied in part. The lack of documentation has not caused any prejudice to Frankfurt at this stage of the case—he has defeated defendants' attempt at summary judgment and his claims will move forward.

## IV.   Conclusion

Frankfurt's motion for summary judgment, [112], is denied. Mega's motion for summary judgment, [114], is denied. Field's motion for summary judgment, [115], is denied. Frankfurt's first motion for judicial notice, [132], is granted in part and denied in part, and his second motion for judicial notice, [159], is denied. Frankfurt's motion to compel, [162], is granted in part as to records of Mega's ownership of the restaurant and hall, but is otherwise denied. Mega shall produce

the requested ownership records within three weeks, and a status hearing is set for

February 9, 2018 at 9:30 a.m.

ENTER:

Manish S. Shah
United States District Judge

Date: January 19, 2018